IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **THE SMITH LAW FIRM, PLLC**<br><br>**Plaintiff**<br><br>v.<br><br>**BEASLEY, ALLEN, CROW, METHVIN, PORTIS AND MILES, P.C., ANTHONY DOW "ANDY" BIRCHFIELD, JR., TED GORDON MEADOWS**<br><br>**Defendants** | **JURY TRIAL DEMANDED**<br><br>Case No. 3:24-cv-564-CWR-ASH |

## COMPLAINT

Plaintiff The Smith Law Firm, PLLC, by and through undersigned counsel, files this Complaint against Defendants Beasley, Allen, Crow, Methvin, Portis and Miles, P.C., Anthony Dow "Andy" Birchfield, Jr., and Ted Gordon Meadows (collectively, "Defendants").

### PARTIES

1. Plaintiff The Smith Law Firm, PLLC ("Plaintiff") is a Mississippi Professional Limited Liability Company with its principal place of business at 300 Concourse Blvd, Suite 104 in Ridgeland, Mississippi. Plaintiff's registered members are residents of the State of Mississippi.

2. Defendant Beasley, Allen, Crow, Methvin, Portis and Miles, P.C. ("Beasley Allen") is an Alabama Professional Corporation incorporated under the laws of the State of Alabama and with its principal place of business in Montgomery County, Alabama. Beasley Allen may be served with process through its Registered Office at 218 Commerce Street, Montgomery, Alabama 36104.

3. Defendant Anthony Dow "Andy" Birchfield, Jr. ("Birchfield") is an attorney licensed in the State of Alabama. Upon information and belief, Birchfield a resident of the State of Alabama. Birchfield is and was, at all times relevant hereto, employed as an attorney by Defendant Beasley Allen. Birchfield may be served with process at his place of employment, Beasley Allen, 218 Commerce Street, Montgomery, Alabama 36104 or by any other means permitted by the Federal Rules of Civil Procedure.

4. Defendant Ted Gordon Meadows ("Meadows") is an attorney licensed in the states of Alabama and Mississippi. Upon information and belief, Meadows is a resident of the State of Alabama. At all times relevant hereto, Meadows was an employee of Defendant Beasley Allen. Meadows may be served with process at his place of employment, Beasley Allen, 218 Commerce Street, Montgomery, Alabama 36104 or by any other means permitted by the Federal Rules of Civil Procedure.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the controversy is between citizens of different states and exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6. The Court has personal jurisdiction over Defendants pursuant to Mississippi's Long-Arm Statute, *Miss Code Ann.* § 13-3-57, as Defendants entered into contracts with Plaintiff, a Mississippi resident, concerning the representation of Mississippi residents, which were to be performed in whole or in part in the State of Mississippi. Additionally, Defendants have committed torts that have injured Plaintiff in the State of Mississippi.

7. Defendants' contacts with the State of Mississippi are sufficient that the Court's exercise of jurisdiction comports with due process. These contacts have been continuous and

systematic over several years and include, without limitation, representing Mississippi residents; participating in talc-related litigation in Mississippi, including in Hinds County, Mississippi; and acting in Mississippi pursuant to the JV Agreement contract with Plaintiff, which has its principal place of business in Madison County, Mississippi.

8. Venue is proper in the United States District Court for the Southern District of Mississippi, Northern Division, pursuant to 28 U.S.C. §1391, as substantial acts, omissions and events that caused Plaintiff's injuries occurred in Madison County, Mississippi, which is located in the district and division in which this matter has been filed, and because Defendants are subject to personal jurisdiction in this district and division as set forth in the preceding paragraphs.

## STATEMENT OF FACTS

### A. The Smith Law Firm Originates the Talc Litigation

9. Plaintiff is a nationally recognized personal injury law firm that represents individuals injured by defective products.

10. Plaintiff conceived of, developed the evidentiary and scientific support for, and filed the first cases alleging that talc-based body powders cause ovarian cancer ("Talcum Powder Litigation").

11. In 2009, Plaintiff filed the first talc case in South Dakota - *Berg v. Johnson & Johnson, et al.*, No. 4:09-cv-04179-KES (D.S.D.).

12. In 2013, Plaintiff successfully tried *Berg* to verdict.

13. In 2014, the Mississippi Attorney General hired Plaintiff to file a Consumer Protection Act suit against Johnson & Johnson relating to its sale of talcum powder products in Mississippi.

3

**B. Beasley Allen Seeks to Join the Talc Litigation, and the Parties Enter a JV Agreement**

14. In November 2013, Defendant Beasley Allen, a personal injury law firm, began showing interest in the Talcum Powder Litigation in November 2013.

15. In December 2013, Plaintiff entered into a joint venture agreement with Defendant Beasley Allen and another law firm, Porter Malouf, P.A. ("Porter Malouf") with respect to the Talcum Powder Litigation.

16. Later in December 2013, Ted G. Meadows ("Meadows"), an attorney at Beasley Allen, sent Plaintiff and Porter Malouf a letter memorializing the Joint Venture Agreement ("JV Agreement"). The JV Agreement was fully executed on January 23, 2024.[1]

17. Under the JV Agreement, Beasley Allen was responsible for performing fifty percent (50%) of the work in the Talcum Powder Litigation. Plaintiff and Porter Malouf collectively were responsible for performing the other fifty percent (50%) of the work.[2] The JV Agreement allocated fees and responsibility for expenses in the Talcum Powder Litigation on the same basis - fifty percent (50%) to Beasley Allen and fifty percent (50%) to Plaintiff and Porter Malouf collectively.

18. As the author of the JV Agreement, Beasley Allen expressly recognized Plaintiff's substantial contributions to the Joint Venture prior to the JV Agreement including:

    a. Initiating the Talcum Powder Litigation;

    b. Securing quality cases, including State Attorney General actions, for the Joint Venture in the Talcum Powder Litigation;

---

[1] December 19, 2013 Letter Agreement ("JV Agreement"), attached as Exhibit 1.
[2] Plaintiff purchased Porter Malouf's interest in the JV Agreement in 2021.

4

    c. Conducting extensive discovery, which resulted in the collection of documents from Johnson & Johnson that would be difficult, if not impossible, to retrieve again;

    d. Retaining, developing, and qualifying the best experts in the Talcum Powder Litigation;

    e. Trying the first case and obtaining a positive verdict in the Talcum Powder Litigation;

    f. Contributing a portion of the potential fee in the South Dakota action, *supra* ¶ 18; and

    g. Contributing fifty percent (50%) of the fee to be recovered in the Mississippi Attorney General suit, *supra* ¶ 19.

19. Plaintiff's continuing responsibilities under the JV Agreement included:

    a. Sharing with Beasley Allen all information regarding and support for the nature of the claims arising in the Talcum Powder Litigation;

    b. Outlining for Beasley Allen the means by which to recognize viable claims in the Talcum Powder Litigation;

    c. Providing Beasley Allen with case screening materials for the Talcum Powder Litigation;

    d. Sharing with Beasley Allen all of the medical literature related to the Talcum Powder Litigation;

    e. Providing Beasley Allen with the expert witnesses, who Plaintiff had already retained and developed for the Talcum Powder Litigation;

  f. Securing Beasley Allen access to all discovery in the Talcum Powder Litigation, including Johnson & Johnson's internal documents, which were produced to Plaintiff prior to entering into the JV Agreement; and

  g. Sharing with Beasley Allen all of Plaintiff's work product pertaining to the Talcum Powder Litigation.

20. Plaintiff's contributions, *supra* ¶¶ 25-26, were ongoing. Plaintiff performed approximately 90% of the courtroom work on behalf of the Joint Venture, and Plaintiff's successes resulted in the Joint Venture securing additional quality cases.

21. Pursuant to the JV Agreement, Beasley Allen was obligated to fund a national television advertising campaign for Talcum Powder Litigation. Beasley Allen also was responsible for handling new client intake; obtaining authorizations, information, medical records, and pathology necessary to appropriate screen potential plaintiffs; and maintaining all client contact.

22. The JV Agreement drafted by Beasley Allen allocates responsibilities among the joint venturers. It does not confer exclusive authority on any of the law firms, nor does it divest any law firm of its obligations to the Joint Venture clients including their respective obligations to communicate and keep the clients informed.[3]

23. The JV Agreement does not confer power-of-attorney on Beasley Allen to unilaterally act on behalf of the Joint Venture's clients.[4]

---

[3] *See, e.g.,* Miss. Rules of Professional Conduct § 1.4 (setting forth requirements for counsel to keep a client reasonably informed, promptly comply with requests for information, and provide explanations to assist the client in making informed decisions); Ala. Rules of Professional Conduct § 1.4 (same).

[4] Plaintiff has power-of-attorney to act on behalf of the Joint Venture's clients through its retention agreements.

24. Rather, the JV Agreement expressly provides that Plaintiff and Beasley Allen "will be jointly responsible for prosecuting the cases and will work together in that regard" and "will jointly represent all of our talcum powder clients."

25. For nearly ten years, Plaintiff and Beasley Allen worked on the Talcum Powder Litigation pursuant to the JV Agreement. Plaintiff served as lead counsel for nine trials in the Talcum Powder Litigation, resulting in multiple verdicts for plaintiffs totaling over $750 million dollars, and establishing the viability and magnitude of the Talcum Powder Litigation.[5]

26. Plaintiff also was lead in the Mississippi Attorney General suit against Johnson & Johnson, which involved multiple appeals and two attempted bankruptcy actions by defendant Johnson & Johnson.

27. Plaintiff settled the Mississippi Attorney General action for $75 million dollars in late 2023/early 2024. Defendants were not attorneys of record, nor did they contribute much to the result. Nevertheless, Beasley Allen, pursuant to its JV Agreement, received 50% of the attorney fees recovered.

**C. Birchfield and Meadows Breach the JV Agreement**

28. On November 9, 2023, Defendant Birchfield sent an email to Plaintiff. In his email, Birchfield affirmed the JV Agreement and that it remains in effect and includes all attorney fees related to the Talcum Powder Litigation from any source. Based on information and belief, Defendants were posturing for what they believed would be a global settlement.

29. Shortly after Birchfield's November 9, 2023 email, the relationship between Plaintiff and Defendants began to sour.

---

[5] Defendant Beasley Allen has never won a trial in the Talcum Powder Litigation where Plaintiff was not present, serving as lead counsel, and performing nearly all of the courtroom work.

30. In early 2024, Birchfield increasingly refused to consult or meaningfully communicate with Plaintiff regarding the Talcum Powder Litigation.

31. The growing rift became a chasm when Johnson & Johnson, in 2024, proposed a pre-packaged bankruptcy plan (the "Plan") to resolve MDL claims in the Talcum Powder Litigation.

32. Although Plaintiff initially was opposed to the plan, subsequent amendments to the proposed settlement provided the Joint Venture's clients additional relief ("Revised Plan"). The Revised Plan was markedly better for the Joint Venture's clients and, therefore, Plaintiff changed its position.

33. Defendants, however, continued to oppose the Revised Plan, not based on its value to the Joint Venture clients, but because Defendant Birchfield had made promises to attorneys outside the Joint Venture. In a letter dated August 26, 2024, Defendant Meadows wrote that Beasley Allen "promised to uphold our duties to all claimants and therefore will not leave any firms behind who have stood with us against J&J bankruptcy efforts." Based on information and belief, Defendants' opposed the Revised Plan because Defendants' promises to law firms outside the Joint Venture would cut into the fees that Defendants would receive.

34. On August 23, 2024, Plaintiff emailed Birchfield with the current version of the Revised Plan stating it was "duty bound" to send the new settlement offer to the Joint Venture clients and "would welcome the opportunity" for Defendants to join Plaintiff in this communication. Defendants did not respond.

35. Instead, on August 26, 2024, Meadows contacted the Joint Venture clients in opposition to the Revised Plan.

8

36. On August 27, 2024, Plaintiff again reached out to Defendants hoping to resolve their differences and pursue the best resolution for the Joint Venture clients. Defendants did not respond.

37. On August 28, 2024, Plaintiff requested a phone call with Birchfield to discuss the Revised Plan and propose edits to address Defendants' concerns. Defendants did not respond.

38. Instead, Defendants wrote Plaintiff on September 5, 2024, threatening litigation if Plaintiff continued to support the Revised Plan.

39. On September 9, 2024, Beasley Allen sent an email to all MDL Counsel requesting a conference call to discuss "misinformation" concerning Plaintiff's support for the Revised Plan.

40. On September 10, 2024, Plaintiff responded pointing out the patently false information about Plaintiff and the Revised Plan in Beasley Allen's September 9 letter. Plaintiff demanded an immediate retraction of Beasley Allen's disparaging and untrue statements about Plaintiff and the Revised Plan.

41. On September 11, 2024, Plaintiff sent a letter to the Joint Venture clients explaining Plaintiff's reasons for supporting the Revised Plan.

42. On or about September 12, 2024, Meadows sent the Joint Venture clients a letter opposing the Revised Plan. In his letter, Meadows questioned Plaintiff's financial condition and urged the Joint Venture clients to reject the Revised Plan. Meadows told the clients, "we recommend that you ignore Mr. Smith's[6] letter and take no action."

43. Rather than issuing a retraction of their disparaging remarks, Defendants filed suit against Plaintiff in the United States District Court for the Middle District of Alabama. The suit alleges *inter alia* that Plaintiff is supports the Revised Plan because Plaintiff is in "financial

---

[6] Allen Smith is lead counsel at Plaintiff The Smith Law Firm, PLLC.

9

distress." This allegation, which is consistent with Defendants' statements published to MDL counsel and the Joint Venture clients, is patently false and defamatory.

44. Plaintiff supports the Revised Plan its terms, after negotiations and numerous amendments, are favorable to the Joint Venture clients. For example:

45. <u>Additional Funds for Current Claimants</u>: J&J has agreed that an additional $500 million dollars be directed to the payment of current Claimants. Claimants are now entitled to $4.975 billion vs. $4.475 billion under the previous plan.

46. <u>Significant Additional Funds for Individual Review Bonuses</u>: Johnson & Johnson has agreed to fund an additional aggregate amount of $1.1 billion into the trust for supplemental payment of talc claims. These additional funds will be used to award Individual Review Bonuses to claimants that meet certain additional criteria. After accounting for this additional $1.1 billion in funding, the total cash contributions to be made to the Talc Personal Injury Trust under the Plan would be approximately $9.1 billion.

47. <u>No Liability of Talc Personal Injury Trust to Pay "Common Benefit" fees (CBFs)</u>: Johnson & Johnson also has agreed to contribute additional money to be used for the payment of common benefit fees to qualifying counsel, outside of the Trust. Although the initial version of the Plan left open what would happen regarding common benefit payments, therefore creating the possibility that each claimants' recoveries would be taxed approximately 10% in common benefit fees and expenses, Johnson & Johnson's agreement to pay these funds directly resolves that concern. In other words, claimants will save/retain approximately 10% of their trust award, which might otherwise have been taxed under the MDL common benefit orders.

48. <u>Assistance in Resolving Medical Liens</u>: Johnson & Johnson has agreed that it's counsel will assist with negotiating a comprehensive medical lien resolution plan with Medicare

10

and private insurers, which could help to reduce any repayment of insurance benefits that might be required by claimants.

49. <u>Payment of Costs and Expenses from Prior Bankruptcy Proceedings</u>: Johnson & Johnson has agreed to reimburse attorneys for the costs of fighting its prior bankruptcy attempts. The benefit is that these fees and costs will not be withdrawn from the Talc Personal Injury Trust. Again, this means claimants do not bear the responsibility for paying these costs.

50. <u>"Contingency Plan" if Bankruptcy is Unsuccessful</u>: Johnson & Johnson has agreed that, in the event the Plan is vacated or defeated, and provided certain conditions are met, the Plan resolution may be converted to a private, non-bankruptcy mass tort resolution program with the monetary compensation being $4.975 billion dollars for current claimants (100% of Revised Plan). In the event the Plan converts to a private resolution program, Johnson & Johnson also will contribute 80% of the Revised Plan's Individual Review Bonuses, and contribute 80% of the Common Benefit Fee payments of the Revised Plan.

51. <u>Faster processing of claims and payment from the Trust</u>: Johnson & Johnson also has agreed to begin reviewing current Claimants' submissions shortly after filing of the Plan, and prior to its confirmation, on its own dime to facilitate faster recovery for current Claimants. Additionally, and provided certain conditions are met, Johnson & Johnson has agreed to allow Claimants to begin receiving awards immediately after the Fifth Circuit approves the Plan, rather than requiring Claimants to wait until after Supreme Court approval. This could yield claimants relief months, if not years, faster than they otherwise might recover under a more typical bankruptcy plan confirmation and implementation timeline.

52. Given the substantial improvements negotiated by Plaintiff, the Revised Plan clearly and obviously is in the best interests of the Joint Venture clients.

11

53. Despite the favorable Revised Plan, Defendants continued their defamatory conduct toward Plaintiff.

54. On September 16, 2024, Birchfield commented to reporter Amanda Bronstad in a Law.com news article that "This $400 billion company is preying on certain lawyers who are in financial distress and demanding that these lawyers turn their backs on their clients."

55. Based on information and belief, Defendants continue to communicate with Joint Venture clients in an effort to thwart approval of the Revised Plan. Defendants reportedly are continue making false and defamatory allegations of "financial distress" toward Plaintiff, are misrepresenting to these Joint Venture clients that Plaintiff no longer represents them, and are instructing the clients to cease all communications with Plaintiff.

56. Plaintiff has fought vigorously against Johnson & Johnson for fifteen years both inside and outside the courtroom in the Talcum Powder Litigation. Plaintiff's negotiation efforts with Johnson & Johnson began not because of alleged "financial distress," as Defendants claim, but rather due to Defendants inability and, at times, refusal to communicate with Johnson & Johnson representatives. What Defendants were unable to achieve in years in the Talcum Powder Litigation, Plaintiff was able to negotiate in weeks, all the while attempting, repeatedly, to involve Defendants—for the benefit of the Joint Venture's clients—in such discussions.

57. In addition to refusing to communicate, Defendants also have abandoned their obligations under the JV Agreement to share in expenses. Currently, Defendants owe:

    a. $1,971,566.09 in client acquisition fees in the Talcum Powder Litigation as of July 31, 2024;

    b. $1,161,370.56 in certain expenses associated with the Talcum Powder Litigation; and

    c. $163,047.88 in other expenses associated with the Talcum Powder Litigation.

58. Plaintiff has written Defendants requesting reconciliation of the outstanding balances owed, but Defendants, specifically Birchfield, has never responded. Plaintiff's lead counsel offered to drive to Montgomery, Alabama, to meet and in an effort to resolve the ongoing differences but Birchfield refused.

59. Instead, Defendants have continued to refuse to communicate and consult with Plaintiff concerning their shared Joint Venture clients and have attempted to shut Plaintiff out of the representation. For example,

    a. Defendants have refused to discuss with Plaintiff MDL settlement negotiations involving the Joint Venture's clients;

    b. Defendants have refused to consult with Plaintiff before communicating with the Joint Venture's clients;

    c. Defendants have refused to provide Plaintiff with the contact information for the Joint Venture's clients; and

    d. Defendants have encouraged the Joint Venture's clients to oppose the Revised Plan without informing them of Plaintiff's view.

60. As a direct and proximate result of Defendants' conduct, Plaintiff has been damages.

61. Defendants have defamed Plaintiff's character and reputation publicly, have attempted to cut off Plaintiff's ability to communicate with its Joint Venture clients, and have threatened, and then sued, Plaintiff to deter its support for the Revised Plan, which Plaintiff strongly believes is in the best interests of the Joint Venture clients. Defendants acts are in violation of the JV Agreement, the Rules of Professional Conduct, and appliable law.

## COUNT I: BREACH OF CONTRACT

62. Plaintiff incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

63. The JV Agreement is a binding and valid contract between Plaintiff and Defendant Beasley Allen.

64. Plaintiff has performed above and beyond its obligations under the JV Agreement, and, as a result, has secured quality cases for the Joint Venture, performed over 90% of all courtroom trial work in the Talcum Powder Litigation, which yielded over $750 million in positive verdicts for plaintiffs, and established the viability and magnitude of the Talcum Powder Litigation as a whole.

65. Defendants have sought to actively work against the Joint Venture and its shared clients by refusing to consider or recommend the Revised Plan for reasons unrelated to the best interests of the clients.

66. Defendants have breached their duties under the JV Agreement including by:

   a. Failing to reconcile and fulfill their obligation to pay 50% of the expenses that the Joint Venture accrued in the Talcum Powder Litigation;

   b. Failing to perform 50% of the total work in the Talcum Powder Litigation;

   c. Failing to meaningfully communicate and consult with Plaintiff in order to adequately and jointly represent the shared clients;

   d. Failing to work together with Plaintiff in the prosecution of the Talcum Powder Litigation;

   e. Actively preventing Plaintiff from communicating with the Joint Venture's clients in the Talcum Powder Litigation;

  f. Unilaterally contacting the Joint Venture's clients without consulting, and in direct opposition to, Plaintiff; and

  g. Permitting Defendants' personal interest in avoiding resolution of the Talcum Powder Litigation through bankruptcy to cloud the independent judgment owed to Plaintiff's clients.

67. As a direct and proximate cause of Defendants' breach of contract, Plaintiff has been damaged in an amount equal to or exceeding $973,243.41, not including costs or interest. Plaintiff reserves the right to amend this Complaint to include additional damages.

### COUNT II: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

68. Plaintiff incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

69. Under Mississippi law, all agreements contain an implied covenant of good faith and fair dealing.

70. By their conduct described herein, and as will be proven at trial, Defendants have breached their duty by operating in a manner inconsistent with the agreed purpose between the parties. Defendants have acted in a manner that is inconsistent with the justified expectations of Plaintiff, which expected and relied upon Defendants to act in good faith and fair dealing in entering into and performing the contract at issue herein.

71. As a direct and proximate result of Defendants' conduct, as described herein, Plaintiff has suffered actual damages and losses and is entitled to the relief requested.

72. Plaintiff is entitled to punitive damages because Defendants have acted intentionally, or with reckless disregard for Plaintiff's rights, as described herein.

## COUNT III:  BREACH OF FIDUCIARY DUTY

73. Plaintiff incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

74. The trust relationship between Plaintiff and Defendants, acting as co-counsel in the pursuit of legal claims on behalf of shared clients, was a fiduciary relationship that requires the utmost fairness and good faith on the part of the parties.

75. By the conduct described herein, Defendants have breached the fiduciary duties owed to Plaintiff.

76. As a direct and proximate result of Defendants' breach of fiduciary duties, Plaintiff has suffered damages and losses and is entitled to the relief requested herein.

77. Defendants' breach of fiduciary duties to Plaintiff also warrants imposition of punitive damages.

## COUNT IV:  DEFAMATION, DEFAMATION *PER SE*, LIBEL, AND LIBEL *PER SE*

78. Plaintiff incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

79. Plaintiff's rights have been violated pursuant to the common law of the State of Mississippi and *Miss. Code Ann.* § 95-1-1 as a direct and proximate result of the written false statements made by Defendants, including those described herein and those that will be proven at trial.

80. These false and defamatory written statements concerning the Plaintiff include, without limitation, the September 9, 2024, MDL Co-Counsel email; the September 12, 2024, Meadows' letter to clients; the September 16, 2024, Birchfield quote to Law.com; and the continued communications to Joint Venture clients such as those detailed above. As a result of

these and other statements which will be revealed in discovery or at trial, Defendants are liable for defamation, defamation *per se*, libel, and/or libel *per se* as set forth herein.

81. Defendants have made unprivileged publication of these written false statements.

82. In making these false statements about Plaintiff, Defendants bear fault at least to the level of negligence.

83. The false statements made by Defendants about Plaintiff are suggestive of conduct incompatible with the proper conduct of Plaintiff's business or trade. As such, Defendants are liable for defamation *per se* and/or libel *per se*.

84. Alternatively, the false statements made by Defendants about Plaintiff have caused Plaintiff to suffer special harm, including financial and/or reputational harm. As such, Defendants are liable for defamation and/or libel.

85. Defendants' conduct also warrants imposition of punitive damages.

## COUNT V: TORTIOUS INTERFERENCE WITH CONTRACT

86. Plaintiff incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

87. Plaintiff has contractual relationships with all clients in Talcum Powder Litigation that originated from Plaintiff and all Joint Venture Clients.

88. By the conduct described herein, including but not limited to, Defendants' false and defamatory statements outlined herein, and communications to clients asserting that Plaintiff is no longer representing them, and urging that clients should not communicate with Plaintiff, Defendants are intentionally and willfully interfering with the business relationships and contracts that Plaintiff holds with Talcum Powder Litigation clients.

89. Defendants' interference with these business relationships and contracts is calculated to cause damage to Plaintiff in its lawful business.

90. Defendants' interference with these business relationships was done with the unlawful purpose of causing damage to Plaintiff without right or justifiable cause and/or by unlawful means.

91. As a result of Defendants' interference with these business relationships, Plaintiff has incurred actual damage and loss, for which Defendants are liable.

92. Defendants' conduct also warrants imposition of punitive damages.

## DAMAGES

93. Plaintiff incorporates by reference, as if fully reproduced herein, the allegations contained in the foregoing paragraphs of the Complaint.

94. There is a causal connection between the acts and/or omissions of Defendants, as described in this Complaint, and the damages sustained by Plaintiff, such that the acts and/or omissions proximately caused or contributed to Plaintiff's damages.

95. As a result of the foregoing acts and/or omissions of Defendant, the Plaintiffs are entitled to the following damages:

    a. compensatory damages as allowed by law for each of the causes of action set forth above;

    b. contractual damages for breaches of contract;

    c. all other economic and non-economic damages allowed by Mississippi law;

    d. any and all damages of every kind allowable by law as a jury may determine to be just, taking into consideration all damages of every kind to Plaintiff; and

e.  punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands judgment from the Defendants and requests that the Court grant the following relief:

a.  Economic and non-economic damages in an amount provided by law and to be supported by evidence at trial;

b.  Punitive damages;

c.  Pre-judgment and post-judgment interest as allowed by law;

d.  Reasonable attorneys' fees, litigation expenses, expert witness fees, and costs of this litigation, together with all costs of court; and,

e.  All other relief to which Plaintiffs may justly and properly be entitled, all within an amount within the jurisdiction of this Court.

Dated: September 19, 2024

Respectfully submitted,

The Smith Law Firm, PLLC

By its attorneys,

CARROLL BUFKIN, PLLC


*/s/ Thomas G. Bufkin*
By: Thomas G. Bufkin, MSB #10810

Thomas G. Bufkin, MSB # 10810
CARROLL BUFKIN, PLLC
1076 Highland Colony Pkwy., Ste. 125
Ridgeland, Mississippi 39157
(601) 982-5011
(601) 852-9450
tgb@carrollbufkin.com